UNITED STATES BANKRUPTCY COURT
THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| ABE'S ELECTRONICS CENTER, INC., D/B/A ABE'S OF MAINE CAMERA AND ELECTRONICS, | Case No.: 12-47723 (NHL) |
| Debtor. | |

### DECLARATION OF JAMES W. FOX IN SUPPORT OF
### PROPOSED SALE OF DEBTOR'S ASSETS

I, James W. Fox, hereby declare, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.      I am a Principal of GlassRatner Advisory & Capital Group, LLC ("GlassRatner"), a management and financial consulting and advisory firm maintaining offices at 60 East 42nd Street, Suite 2200, New York, NY.

2.      On January 23, 2013, the above-captioned Debtor (the "Debtor") retained GlassRatner to provide investment banking services, on a contingent fee basis, with respect to this chapter 11 case.

3.      I submit this Declaration in support of Debtor's Motion for an order approving proposed bidding procedures and authorizing the sale of Debtor's assets.

4.      Except as otherwise noted, I have personal knowledge of the matters set forth in this Declaration.

### I.      Background

5.      GlassRatner has advised in many investment banking transactions, both in and outside of chapter 11. These transactions have included M & A, financing, and balance sheet

2186649-1

restructuring assignments. Many of these engagements have also included a valuation component (including insolvency opinions). A representative listing of our investment banking assignments in the bankruptcy and restructuring sectors includes: PCS Cellular, Worldspace, Inc., Building Materials Holding Corp., NPI Wireless, AmFin, Waste 2 Energy, Harron Communications, AB Dick, Inc., Fairfield Residential, LLC, NOVA BioSource Fuels, Inc., Hayes Lemmerz, Borden Chemicals & Plastics, Proliance International, Nederlandse Radiateuren Fabriek BV, FRD Acquisition Co. (Coco's and Carrows restaurants), Fansteel, Inc., Goldman Industries, PJ Finance, Cornerstone Ministries Investments, M. Rothman, Schuylkill Products, Inc., Chesapeake Wallcovering Corp., GEO Lima Ethanol, Chevy's Inc., TIRO Industries, WirelessTelecommunications, Inc., Alset Owners, LLC, BT Tire Group Holding, LLC, EZ Lube, LLC, HPG International, Inc., TallyGenicom, L.P., LoveSac, Inc., Eigen, Inc., Zohar Waterworks, LLC, Alexus, Inc., C-2 Media, Better Methods, Inc., Atlantic Marine, Inc., Global Technovations, Inc., Novo Network Systems, Inc., EOIR Technologies.

6.    GlassRatner's non-restructuring investment banking engagements have included CPC Chemical, DyStar Corp., Coby Electronics, Oakwood Homes, DVL, Inc., Craftsman Press, Tompkins Associates, Manufacturing Management, Inc., International Magnetic Imaging, and Xplor Corporation.

7.    On March 4, 2013, this Court granted the Application of the Debtor for an Order Authorizing the Employment and Retention of GlassRatner Advisory & Capital LLC as Investment Banker *Nunc Pro Tunc* to January 23, 2013.

## II.    Marketing Efforts

8.    From the date of retention, GlassRatner has been in the process of actively marketing the Debtor's assets. We have devoted significant time and resources to the marketing

2

effort by developing and distributing marketing materials to potential interested parties, approaching potential parties, facilitating meetings and negotiations between the Debtor and potential parties, and responding to due diligence requests.

9.      At the outset of our involvement, we identified forty-nine potential purchasers (the "Potential Purchasing Parties"). For evaluation and contact purposes, we divided these parties into the following five basic categories:

(a)      Competitors (other online retailers of consumer electronics products);

(b)      Traditional, "brick and mortar" retailers of consumer electronics products;

(c)      Consumer electronics distributors;

(d)      Manufacturers; and

(e)      Financial investors (most having retail and/or consumer electronics investment interests).

10.      We made telephone contact with thirty-seven of the Potential Purchasing Parties. The other twelve were either unreachable or known to be having their own operating and financial difficulties, and hence were not in a position to pursue a transaction with the Debtor. We chose to make telephone contact rather than, for example, some type of broad email campaign because our previous experience indicates that a one-by-one telephone marketing program is more effective for the following reasons:

(a)      It is considered by potential investors to be more professional;

(b)      Through a telephone outreach, we are able to ensure that we speak to a true decisionmaker or influencer of the target company; and

(c)      In many instances, the actual telephone contact provides an immediate opportunity to discuss the details and merits of the investment opportunity.

3

11.    Ten parties requested and received a Confidentiality and Non-Disclosure Agreement ("CNDA") and the accompanying executive summary.

12.    Of these ten parties, eight executed the CNDA (the "CNDA Parties") and thereafter received the Confidential Information Memorandum ("CIM"), which describes the Debtor's assets, liabilities, and financing and investment opportunities.  In an effort to enhance the chances of generating investment interest, we also developed and provided the CNDA Parties a turnaround plan, which detailed the financing that would be needed to effect a turnaround in the operation, as well as the use of such proceeds and near-term financial projections.

13.    Only one CNDA Party, a distributor of consumer electronics products seeking alternative sales channels, had enough interest to visit the Debtor's facilities for an on-site visit. However, following that visit, that party ultimately did not pursue further discussions with the Debtor.

14.    Another CNDA Party, a major industry distributor, performed extensive due diligence on the Debtor's operations and financials.  Negotiations eventually broke down because this party could not reconcile the possible impact that the purchase of Abe's would have on its retailer customer base.

15.    We met with a third CNDA Party, a financial investor, at our New York offices for a detailed discussion of the investment opportunity. They also ultimately passed on the opportunity.

16.    Finally, a competitor expressed some interest in evaluating the assets of the Debtor for a possible purchase. However, this party had not indicated any preparedness to go forward.

4

2186649-1

17.     Based on our thorough marketing process and the negotiations we have had with potential interested parties, it appears that Westpark Electronics LLC ("Westpark") is the only potential purchaser of the Debtor's assets.

18.     There appear to be a number of reasons for the relative lack of investment interest in the Debtor's assets. The reasons which have been cited specifically by potential parties we approached and perceived by GlassRatner based on our industry experience include the following:

(a)     In the past several years, there have been a large number of consumer electronics companies that have either declared bankruptcy or simply gone out of business. This trend has imparted a negative image on this industry in the eyes of potential investors.

(b)     In connection with that trend, a number of the companies we identified experienced operating or financial difficulties. For example, Electronics Expo, another New Jersey retailer of consumer electronics, itself filed for chapter 11 bankruptcy. GlassRatner is also aware of a significant consumer electronics company, which also happens to be based in the New York area, that is very likely to cease its operations in the near future.

(c)     There is considerable concern among existing and prospective industry competitors regarding the formidable competitive impact of Amazon.com, Inc. on the market as a whole. Specifically, we understood that Amazon.com recently modified its merchandising fee structure in a way that adversely affects the business model of the Debtor and many similar consumer electronics companies.

5

2186649-1

(d) In recent years, the pace of technological change has accelerated to the point where previously marketable goods can quickly become effectively technologically obsolete. This trend, which has been driven in part by innovations with smartphones, has wreaked havoc on the borrowing bases of companies with asset-based loans, which are common in the consumer electronics industry.

(e) The reputation of the Debtor has been negatively affected by its pricing practices.

(f) Approximately 40% of the Debtor's business is in the photography sector. For many potential investors, this concentration was not attractive.

(g) Some potential buyers perceived that an investment in the Debtor would impinge negatively on their existing operating relationships.

19. Following the Bankruptcy Court hearing on June 17, 2013, GlassRatner provided Olshan with the contact information for the Potential Purchasing Parties so that these parties may receive notice of the Debtor's Bidding Procedures, the Order approving the Bidding Procedures and the Auction and Sale Notice, as required by the Bankruptcy Court's order.

20. I have reviewed the affidavit of service filed by Olshan on June 19, 2013 (Dkt. No. 190), in which Olshan certifies that it has served, among other notice parties, the Potential Purchasing Parties with the Court's Order approving the Bidding Procedures, the Bidding Procedures, and the Auction and Sale Notice.

21. With the existing stalking horse bid from Westpark and bidding procedures that have been submitted to this Court, GlassRatner revisited the list of Potential Purchasing Parties to determine if any may have interest in bidding on the Debtor's assets.

6

(a)    After Westpark submitted its signed Asset Purchase Agreement ("APA")
to the court, GlassRatner revisited those parties from the original listing
considered viable potential acquirers—making contact with twenty nine in
total—to inform them of the stalking horse bid and the corresponding
bidding procedures.

(b)    Of the twenty nine parties so contacted, six parties were interested in
reading the updated teaser and, after doing so, two requested a copy of the
CNDA.

(c)    One of these two CNDA recipients executed the CNDA, and GlassRatner
forwarded along the CIM to this potential party for further consideration.

(d)    The second potential party that requested a CNDA has yet to return a
signed copy.

(e)    To this point, none of the revisited Potential Purchasing Parties contacted
in the second round of calls has submitted the documentation necessary
for becoming a Qualified Bidder.

### III.    Conclusion

22.    I hereby declare under the penalty of perjury that the foregoing statements are true
and correct to the best of my knowledge, information and belief.

Dated: _July 9, 2013_

_James W. Fox_
JAMES W. FOX

7

2186649-1